Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| NANCY REYES DÍAZ<br><br>Apelada<br><br>V.<br><br>MUNICIPIO DE CAGUAS; MAPFRE PRAICO INSURANCE COMPANY; DUEÑO I; ASEGURADORA A; DUEÑO II Y ASEGURADORA B<br><br>Apelante | KLAN202400259 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso Núm.: CG2021CV02905<br><br>Sobre: Daños y Perjuicios (Caída) |

Panel integrado por su presidenta; la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 14 de noviembre de 2024.

El 15 de marzo de 2024, compareció ante este Tribunal de Apelaciones, la Autoridad de Acueductos y Alcantarillados de Puerto Rico (en adelante, AAA o parte apelante), por medio de *Apelación.* Mediante esta, nos solicita que revisemos la *Relación del Caso, Determinaciones de Hechos, Conclusiones de Derecho y Sentencia* emitida el 23 de enero de 2024, notificada el 26 de enero de 2024, por el Tribunal de Primera Instancia, Sala Superior de Caguas.

Adelantamos que, por los fundamentos que adelante se esbozan, se *modifica* la *Sentencia* apelada, a los fines de determinar que: 1) tanto la AAA como el Municipio de Caguas le responden a la señora Reyes Díaz, en un cincuenta por ciento (50%) de responsabilidad cada uno por la caída sufrida por esta, y 2) a los fines de reducir el interés legal por sentencia al 5.50%, en lugar del 9.50% impuesto y así modificada, se *confirma* la *Sentencia* apelada.

Número Identificador

SEN2024 _____

**I**

El caso que nos ocupa tiene su génesis en una *Demanda* instada el 10 de noviembre de 2021 por la señora Nancy Reyes Díaz (en adelante, parte apelada o señora Reyes Díaz) en contra del Municipio Autónomo de Caguas (en adelante, Municipio) en la que reclamó haber sufrido daños como consecuencia de una caída sufrida por esta, el 7 de septiembre de 2021.

La *Demanda* en cuestión fue enmendada el 22 de diciembre de 2021, a los fines de incluir a Óptima Seguros como la compañía aseguradora del Municipio de Caguas; a la Autoridad de Acueductos y Alcantarillados (en adelante, AAA o parte apelante) y a MAPFRE, como la compañía aseguradora de la AAA.

En apretada síntesis, en la aludida *Demanda Enmendada* la señora Reyes Díaz alegó que, mientras caminaba por una acera de la Calle Ruiz Belvis, frente a la Plaza R. Palmer en Caguas, tropezó con la base de una tapa de un contador de la AAA que sobresalía de la superficie, lo que provocó que perdiera el balance y cayera súbita y aparatosamente al suelo, causándole daños.  Reclamó que, como consecuencia de la caída sufrió traumas, laceraciones, esguinces, hematomas, tendinitis y contractura del hombro derecho, que requirió que se sometiera a tratamiento médico y quedó con un impedimento permanente de sus funciones fisiológicas generales.

El Municipio y su compañía aseguradora contestaron la *Demanda Enmendada* el 28 de febrero de 2022, en la que negaron responsabilidad y alegaron afirmativamente que, la causa próxima de los daños alegados por la parte apelada fueron los actos u omisiones de la AAA.

A su vez, la AAA y su compañía aseguradora, presentaron su *Contestación a Demanda* el 25 de abril de 2022, en la cual eminentemente, negaron las alegaciones, aduciendo falta de conocimiento y creencia para formular su alegación responsiva.

El 23 de mayo de 2023, las partes presentaron ante el foro primario el Informe de Conferencia Preliminar entre Abogados. Subsiguientemente, el 30 de mayo de 2023, se llevó a cabo la Conferencia con Antelación al Juicio y Vista Transaccional.

El Juicio en su Fondo se celebró el 4 de octubre de 2023. Conforme surge de la *Minuta* del Juicio[1], el foro *a quo* admitió como prueba estipulada entre las partes la siguiente:

> [D]e la *Moción Para Anejar Prueba* entrada #49 del sistema SUMAC se marcaron como **exhibits estipulados** los documentos anejados:
>
>> Exhibit Est. 1 Copia certificada del expediente médico de HIMA San Pablo de la paciente Nancy Reyes (19 folios primera parte) (6 folios segunda parte)
>>
>> Exhibit Est. 2 Curriculum Vitae del Dr. Eric Javier Camacho (4 Folios)
>>
>> Exhibit Est. 3 Certificación de jurisdicción del Municipio de Caguas (1 folio)
>
> [D]e la *Moción Sometiendo Prueba Documental* entrada #50 del sistema SUMAC se marcó como **exhibits estipulados** el documento anejado:
>
>> Exhibit Est. 4 Common [Policy] Declarations de Optima Seguros, LLC #55-CP-00061503-1 a favor del Municipio de Caguas (11 folios)
>
> [D]e la *Moción Acompañando Prueba Documental AAA* entrada #47 del sistema SUMAC se marcaron como **exhibits estipulados** los documentos anejados:
>
>> Exhibit Est. 5 Copia certificada de Common Policy Declaration de MAPFRE/PRAICO Insurance Co. #1100218005140 a favor de la AAA (92 folios)
>>
>> Exhibit Est. 6 Aviso de Ocurrencia de AAA suscrito por Laiza M. Pizarro Santiago caso #AAA-33085 (7 folios)
>
> El licenciado Torres presentó su desfile de prueba testifical con los testimonios del Dr. Eric Javier Camacho, Nancy Reyes Díaz y como testigo hostil a Laiza M. Pizarro Santiago y al Ing. José Rivera González, todos ellos debidamente juramentados. También ofreció y el tribunal ordenó que se marcara como exhibit de la parte demandante de la *Moción Para Anejar Prueba* entrada #49 del sistema [SUMAC] el anejo identificado número 1:

---

[1] Apéndice VI del recurso de Apelación.

Exhibit 1 *Independent Medical Evaluation* de Nancy Reyes Díaz por el Dr. Eric Javier Camacho (7 folios)

y de la *Moción Para Anejar Prueba* entrada #49 del sistema [SUMAC] el anejo identificado número 2:

Exhibit 2A-2E Varias fotos a color (5 fotos)

Luego de ello, el licenciado Torres sometió su caso.

El 23 de enero de 2024, el Tribunal de Primera Instancia, emitió *Relación del Caso, Determinaciones de Hechos, Conclusiones de Derecho y Sentencia,* en la cual hizo constar que las partes estipularon los siguientes hechos incontrovertidos:

1. La demandante Nancy Reyes Díaz es mayor de edad, soltera y vecina de Aguas Buenas, Puerto Rico.

2. El demandado Municipio de Caguas es una entidad con capacidad para demandar y ser demandada quien para la fecha del 7 de septiembre de 2021 estaba encargada de darle el mantenimiento a la acera de la Calle Ruiz Belvis, frente a la Plaza Santiago R. Palmer y lo que era *Subway* en Caguas.

3. La codemandada MAPFRE PRAICO Insurance Company es una compañía de seguros debidamente autorizada a expedir pólizas de seguros en Puerto Rico, quien para el 7 de septiembre de 2021 había expedido y tenía en pleno vigor pólizas de seguros a favor de la Autoridad de Acueductos y Alcantarillados la cual respondería en el único caso en que se adjudique negligencia a su asegurado.

4. La codemandada Optima Seguros, LLC. es una compañía de seguros debidamente autorizada a expedir pólizas de seguros en Puerto Rico, quien para el 7 de septiembre de 2021 había expedido y tenía en pleno vigor pólizas de seguros a favor del Municipio de Caguas, la cual está sujeta a sus términos, cláusulas y exclusiones.

En su *Sentencia,* el foro primario realizó las siguientes determinaciones de hechos:

1. La demandante Nancy Reyes Díaz tiene 63 años, es soltera, fue operada de corazón abierto previo a la ocurrencia del accidente del caso de epígrafe, cuida en su hogar a su madre de 92 años de edad y reside en el Barrio Jagueyes en Aguas Buenas. Es diestra y previo al 7 de septiembre de 2021 la demandante no tenía condiciones o problemas en su hombro derecho ni en su rodilla izquierda. Había tenido

problemas y tratamiento previo a la caída para su espalda.

2. El demandado Municipio de Caguas es una entidad con capacidad para demandar y ser demandada quien para el 7 de septiembre de 2021 era el dueño de la acera de la calle Ruiz Belvis frente a la Plaza Santiago R. Palmer y lo que era Subway en Caguas y era la encargada de su mantenimiento.

3. La codemandada Optima Seguros es una compañía de seguros debidamente autorizada a expedir pólizas de seguros en Puerto Rico, quien para el 7 de septiembre de 2021 había expedido y tenía en pleno vigor una póliza de seguros a favor del Municipio de Caguas, la cual cubre la reclamación de epígrafe.

4. La demandada Autoridad de Acueductos y Alcantarillados es una entidad con capacidad para demandar y ser demandada quien para el 7 de septiembre de 2021 era el dueño y encargado de dar mantenimiento a la tapa de metal con la que tropezó la demandante y del contador que existe debajo de la misma.

5. La codemandada MAPFRE PRAICO Insurance Company es una compañía de seguros debidamente autorizada a expedir pólizas de seguros en Puerto Rico, quien para el 7 de septiembre de 2021 había expedido y tenía en pleno vigor una póliza de seguros a favor de la A.A.A. la cual respondería en el único caso en que se adjudique negligencia a su asegurado por una suma mayor al deducible de $100,000.

6. El 7 de septiembre de 2021 la demandante llegó en transporte público desde su casa en Aguas Buenas hasta el centro del pueblo de Caguas para realizar varias gestiones médicas de su madre. Una vez terminó las gestiones se disponía a llegar al lugar donde se toma el [transporte] público de regreso a su casa. Mientras caminaba por la acera de la calle Ruiz Belvis, frente a la Plaza Santiago R. Palmer en Caguas, al llegar frente al local comercial que era Subway, se encontró con una persona mayor que caminaba en dirección contraria por lo que se movió hacia su derecha para cederle el paso. Al continuar la marcha tropezó con un desnivel que creaba la tapa de metal de un contador propiedad de la A.A.A.

7. La cubierta del contador de la A.A.A. con el que tropezó la demandante mide cinco (5) pies de longitud y veintiocho (28) pulgadas de ancho. Es color marrón oscuro y tiene un marco o base alrededor y dos tapas dentro de dicho marco. La base o marco está elevada una pulgada y media (1½) de la superficie en su lado derecho creando un desnivel con la acera que, a simple vista, no es fácil

distinguir.[2] El desnivel no es adecuado e incumple con la reglamentación y parámetros aplicables a aceras[3].

8. Los lectores de contadores, empleados de la A.A.A., deben identificar las condiciones peligrosas que hay con los contadores y sus tapas para que se corrijan las mismas. Al percatarse de alguna condición de peligrosidad su deber es notificarlo a la A.A.A. para que se corrija la misma ya que solo la A.A.A. puede intervenir con las tapas y los contadores que le pertenecen[4]. En el presente caso, aun cuando hubo lecturas del contador en controversia y la base del contador excedía la superficie de la acera de forma inadecuada y en exceso a lo permitido, los lectores de la A.A.A. no notificaron la condición de peligrosidad y deficiencia para que la misma se corrigiera. Dicha omisión constituye negligencia por parte del personal de la A.A.A. y, por ende, de la A.A.A.

9. **Aun cuando la condición peligrosa lleva años en el lugar, el Municipio de Caguas, como dueño de la acera, no ha notificado o requerido a la A.A.A., como dueña del contador y la tapa, que corrija la condición peligrosa existente que crea el desnivel en la acera**[5]. (*Énfasis suplido*)

10. Al tropezar con la tapa de metal la demandante perdió el balance y cayó fuertemente contra el piso.

11. Al caer colocó sus manos para evitar golpearse por lo que se raspó sus manos, tuvo laceraciones y hematomas en el codo derecho y la rodilla izquierda. Sintió un dolor bien fuerte en su cuerpo por lo que tuvo que esperar para poder ponerse de pie. Cuando se reincorporó se recostó de una pared cercana en lo que se recuperaba. Mientras se recuperaba tenía dificultad para respirar por la magnitud del golpe. La persona mayor a la cual le cedió el paso se quedó un rato acompañando a la demandante en lo que se recuperaba. Mientras se recuperaba pasó una patrulla de la Policía, por lo que la persona la llamó para que atendieran a la demandante.

12. Al atender y ver a la demandante, el policía llamó una ambulancia, la cual llegó al lugar del incidente. El personal de paramédicos subió a la demandante a la ambulancia para poder atenderla, tomarle los signos vitales y curarle las heridas que tenía. Los paramédicos le ofrecieron llevarla al hospital, pero la demandante, por la preocupación

---

[2] La Juzgadora de instancia consignó en su dictamen que adoptó el testimonio de la demandante como uno creíble, cándido y coherente.

[3] Este hecho fue aceptado tanto por el representante del Municipio de Caguas como la representante de la AAA, que testificaron durante la vista en su fondo.

[4] Esta información fue declarada por la testigo de la AAA durante la vista en su fondo, la señora Laiza Pizarro Santiago.

[5] Testimonio brindado por el testigo del Municipio de Caguas.

de que su madre anciana estaba sola en su casa, rechazó el ofrecimiento para poder llegar a su casa.

13. Una vez la curaron la demandante llamó un taxi para que la llevara a su casa. Cuando llegó a su casa, por el dolor tan fuerte que sentía decidió recostarse a descansar ya que entendía que con descanso mejoraría.

14. Estuvo en su casa convaleciendo hasta el 9 de septiembre de 2021, al ver que el dolor aumentaba y era demasiado fuerte, decidió ir a sala de emergencias. Para llegar al hospital tuvo que tomar transportación pública desde su casa en Aguas Buenas hasta la sala de emergencias del Hospital HIMA en Caguas. Allí le realizaron radiografías del hombro derecho y la rodilla izquierda y le administraron medicamentos para el dolor. Se le diagnosticó dolor de hombro derecho y rodilla izquierda y fue dada de alta con medicamentos e instrucciones de que fuera a su médico primario.

15. A los pocos días la demandante tuvo que ir a su médico de cabecera quien la refirió para que recibiera terapia física. La demandante fue tratada por la fisiatra Dra. Sara Vicente, quien recomendó terapia física dirigida al área del hombro derecho, cervicales y lumbares. También le ordenó radiografías adicionales del área cervical y lumbar y un sonograma a su hombro derecho.

16. El 20 de octubre de 2021 le realizaron el sonograma del hombro derecho el cual demostró que la demandante tenía una inflamación de la bursa subdeltoidea (bursitis) y una tendinosis (inflamación) del tendón del supraespinatus del hombro derecho. La demandante recibió seis (6) sesiones de terapia física las cuales consistieron en colocarle pads calientes y fríos, electricidad y ejercicios. Las terapias duraban aproximadamente una hora, pero no causaban alivio, sino que le provocaban más dolor.

17. Luego de las terapias, al ver que no mejoraba, se le recomendó a la demandante realizarse un bloqueo, pero la demandante decidió no realizárselo por miedo a que empeorara.

18. El tratamiento recibido por la demandante fue dado en Caguas por lo que la demandante tenía que viajar desde Aguas Buenas a Caguas para visitar los médicos. Un año después de la caída la demandante continuaba con dolores en el hombro derecho y la rodilla izquierda.

19. Al presente la demandante tiene molestias en su hombro, tiene problemas para poder hacer los quehaceres en el hogar por las limitaciones físicas que le crean las lesiones. Tuvo que visitar múltiples médicos para sus condiciones tales como sala de

emergencias, su médica primaria, fisiatra y ortopeda. Tiene debilidad en su hombro derecho, que es su extremidad dominante. Existe un riesgo de que al sustituir continuamente el uso de su extremidad dominante por las limitaciones sobre utilice la contraria y cause futuros daños. Su diario vivir se ha trastocado por las lesiones. Tiene dificultad en subir su brazo, subir escaleras, caminar, etc. Su propiedad tiene dos niveles por lo que se le hace difícil bajar al sótano de la propiedad. Igualmente tiene dificultad para cuidar a su madre anciana, quien está a su cargo.

20. La demandante tiene un dos (2) por ciento de impedimento de sus funciones fisiológicas generales correspondiente a su hombro derecho y rodilla izquierda[6]. Para llegar a esta determinación el perito Dr. Eric Javier Camacho utilizó el expediente médico de la demandante, los diagnósticos dados por los médicos que trataron a la demandante, los estudios clínicos objetivos (radiografías y sonograma) y la corroboración con su examen al momento de su evaluación más de un año luego de ocurrida la caída.

En su *Sentencia* el Tribunal de Primera Instancia concluyó lo siguiente:

Al aplicar el Derecho antes mencionado, es imperativo concluir que durante la vista en su fondo se presentó prueba concluyente de que en el lugar donde la demandante tropezó existía una condición peligrosa que no debió existir. Tanto el testimonio de la representante de la A.A.A. como el del director de Obras Públicas del Municipio demostraron que en la acera había un desnivel que excedía los máximos permitidos y que el mismo representaba una condición peligrosa. Ese desnivel era creado por una tapa de contador comercial de la A.A.A. y se encontraba en una acera perteneciente al Municipio. Por lo tanto, mantener dicha condición peligrosa constituye una acción negligente por parte de los demandados que les impone responsabilidad por los hechos. Definitivamente, la responsabilidad principal debe recaer sobre el dueño de la tapa del contador desnivelada quien tenía la obligación principal de velar porque su propiedad estuviera en buenas condiciones y no se causara daños a los ciudadanos que utilicen la acera. La prueba demostró que el personal de la A.A.A. acudía a leer el contador en controversia y los otros contadores que estaban a su alrededor al menos cada dos meses, sin embargo, nunca notificaron la deficiencia o condición peligrosa del desnivel de la tapa sobre la acera,

---

[6] La demandante tuvo una caída previa a la de autos, pero en la misma no hubo lesión o daños algunos a las regiones anatómicas afectadas en esta ocasión. La demandante tenía condiciones preexistentes en las áreas lumbares y cervicales, condiciones que el perito tomó en consideración al momento de evaluarla para determinar el impedimento. Por lo tanto, quedó establecido que el impedimento de 2% es exclusivamente relacionado a los daños sufridos por la caída del caso de autos.

responsabilidad que tenían e incumplieron. La A.A.A. como cualquier otra entidad tiene la obligación de cuidar su propiedad y mantenerla en buen estado. En el presente caso no lo hicieron. Por lo tanto, la omisión de corregir la condición peligrosa en la tapa del contador le es atribuible directamente a la A.A.A. De haber corregido la condición peligrosa la caída de la demandante no hubiera ocurrido.

**Por otro lado, aun cuando la condición peligrosa la provoca la tapa del contador de la A.A.A., también es cierto que dicha tapa desnivelada se encuentra en una acera del Municipio y el Municipio tenía el deber de mantener la acera en razonable estado de seguridad, cosa que no hizo al permitir que la A.A.A. mantuviera la tapa del contador en desnivel. Durante la vista en su fondo se demostró que el Municipio en ningún momento requirió a la A.A.A. la corrección del desnivel en su propiedad, por lo tanto, violentó su obligación de mantener la acera en condiciones seguras para sus ciudadanos.**
(*Énfasis suplido*)

Por último, de la prueba testifical ofrecida y creída, así como las fotos presentadas, demuestran que el desnivel era ocasionado por la diferencia de nivel del borde de la tapa y la tapa con respecto a la acera y que tanto el borde del contador como la tapa eran del mismo color, lo que hacía el desnivel difícil de identificar para el peatón. De igual forma, no se presentó prueba alguna que nos permita concluir que la demandante caminara de forma atolondrada o negligente para poder imputarle algún grado de negligencia por su caída. Al contrario, según el testimonio creído, la demandante caminaba normalmente por la acera y el tropiezo se debió a que la diferencia de nivel se disimulaba por el color uniforme del borde y la tapa del contador. El desnivel era suficiente para provocar el tropiezo, pero no para ser identificado por el peatón al caminar por el área. Por lo tanto, concluimos que no medió negligencia por parte de la demandante.

Determinamos que la caída de la demandante se debió a la negligencia concurrente de la A.A.A. en un sesenta y cinco (65) por ciento y el Municipio en un treinta y cinco (35) por ciento. La A.A.A. por ser la dueña de la tapa y la caja del contador desnivelado y el Municipio como dueño de la acera donde se encuentra el desnivel.

[…]

En el caso de autos, la prueba vertida durante el juicio con el testimonio de la demandante, el perito médico, Dr. Eric Javier Camacho y la prueba médica, demostró que como consecuencia de la caída la demandante sufrió una bursitis y tendinitis en su hombro derecho (mano dominante) y trauma y dolores residuales en su rodilla izquierda. Ambas lesiones le causan un dos (2) por ciento de impedimento de sus funciones fisiológicas que le provocan continuas limitaciones y efectos en su diario vivir. A la fecha de la vista en su fondo, más de

dos años desde el incidente, la demandante aquejaba dolores y limitaciones producto de las lesiones. Además, había recibido tratamiento de terapias físicas sin que la condición desapareciera.

En vista de la casuística antes citada y de la prueba vertida durante la vista en su fondo, estimamos los daños físicos, lesiones, impedimento fisiológico y tratamiento médico recibido por la demandante en la suma de $20,000.

Por otro lado, el reflejo de la demandante narrando sus lesiones, contratiempos, dolores, limitaciones y sinsabores producto de la caída, nos hace estimar sus angustias y sufrimientos mentales en la suma de $15,000.

Finalmente, la primera instancia judicial dictaminó lo siguiente:

En atención a las Determinaciones de Hechos y las Conclusiones de Derecho antes expuestas, las cuales se hacen formar parte integral de esta Sentencia, se realizan los siguientes pronunciamientos:

a. Se condena solidariamente a los demandados A.A.A.[7], Municipio de Caguas y Óptima al pago a la demandante de la suma de $35,000.

b. Se impone a la A.A.A. el 65% de negligencia.

c. Se impone al Municipio el 35% de negligencia.

d. Se impone a ambos demandados el pago de las costas a favor de la demandante.

e. Esta Sentencia devengará intereses legales, a razón de 9.50% anual desde dictada y hasta su total pago.

Inconforme con la determinación, el 15 de marzo de 2024, la AAA compareció ante nos mediante recurso de Apelación, en el que le imputó al foro a quo, haber cometido los siguientes errores:

1. Erró el Honorable Tribunal de Primera Instancia al adjudicar el 65% de la responsabilidad a la AAA por los daños sufridos por la parte apelada y no haber adjudicado la mayoría de la responsabilidad al Municipio de Caguas, cuando estatutariamente, son los Municipios y no la AAA, quienes responden por desperfectos en la superficie de las aceras.

2. Erró el Honorable Tribunal de Primera Instancia al adjudicar compensación excesiva en daños.

---

[7] No se impone responsabilidad de pago a MAPFRE toda vez que la cuantía en Sentencia no excede la suma de $100,000, según estipulado por las partes.

3. Erró el Honorable Tribunal de Primera Instancia al imponer a la AAA una tasa de interés de 9% cuando procede la tasa aplicable a instrumentalidades del ELA de 5.5%.

4. Erró el Honorable Tribunal de Primera Instancia al declarar No Ha Lugar la solicitud de determinaciones adicionales de hechos y reconsideración de sentencia presentada por la AAA el 12 de febrero de 2024.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II**

### A. Deferencia Judicial

Según es sabido, las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de gran deferencia por parte de los foros apelativos. *Argüello v. Argüello*, 155 DPR 62 (2001); *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987); *Hernández Maldonado v. Taco Maker*, 181 DPR 281 (2011); *SLG Rivera Carrasquillo v. AAA*, 117 DPR 345, 356 (2009); *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 779 (2022).

Sin embargo, la deferencia judicial no es absoluta, pues podrá ser preterida en ciertas instancias. Nuestro Máximo Foro ha reiterado que, los tribunales apelativos "no debemos intervenir con las determinaciones de los juzgadores de primera instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto". *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021); *SLG Rivera Carrasquillo v. AAA*, supra, pág. 356; *Ortiz Ortiz v. Medtronic*, supra, pág. 778, *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022)[8].

No obstante, "la tarea de determinar cuándo un tribunal ha abusado de su discreción no es una fácil. Empero, no tenemos duda de que el adecuado ejercicio de discreción judicial está

---

[8] Véase también *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 908-909 (2012); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750 (2013).

estrechamente relacionado con el concepto de razonabilidad". *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013). Es por lo que, nuestra más Alta Curia ha definido la discreción como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *IG Builders et al. v. BBVAPR*, 185 DPR 307, 338 (2012). Así, la discreción se "nutr[e] de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; no es función al antojo o voluntad de uno, sin tasa ni limitación alguna". Ello "no significa poder para actuar en una forma u otra, haciendo abstracción del resto del Derecho". (Citas omitidas). *SLG Zapata-Rivera v. J.F. Montalvo*, supra, pág. 435.

### B. Responsabilidad Civil Extracontractual

Como sabemos, en nuestro ordenamiento jurídico, la responsabilidad civil extracontractual emana del Artículo 1536 del Código Civil de Puerto Rico 2020, 31 LPRA sec. 10801 *et seq.*, que dispone que la persona que por culpa o negligencia cause daño a otra, viene obligada a repararlo. *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465 (2022); *Colón Santos v. Coop. Seg. Mult. P.R.* 173 DPR 170,177 (2008).

Para que prospere una reclamación por daños y perjuicios al amparo del referido precepto legal, se requiere la concurrencia de tres elementos, los cuales tienen que ser probados por la parte demandante: (1) el acto u omisión culposa o negligente; (2) la relación causal entre el acto u omisión culposa o negligente y el daño ocasionado; y (3) el daño real causado al reclamante. *Cruz Flores v. Hosp. Ryder et al.*, supra; *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010).

La culpa o negligencia es falta del debido cuidado, esto es, no anticipar ni prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en tales circunstancias. *Montalvo v. Cruz*, 144 DPR 748, 755 (1998).

Cónsono con lo anterior, a través de la jurisprudencia observamos que un elemento esencial de la responsabilidad civil extracontractual es el factor de la previsibilidad. El deber de previsión no se extiende a todo riesgo posible, pues, es necesario examinar si un daño pudo ser el resultado natural y probable de un acto negligente. *Cruz Flores v. Hosp. Ryder et al.*, supra. Para determinar si el resultado era razonablemente previsible, es preciso acudir a la figura del hombre prudente y razonable, también conocida como el buen padre de familia, que es aquella persona que actúa con el grado de cuidado, diligencia, vigilancia y precaución que exigen las circunstancias. *Nieves Díaz v. González Massas, supra*, pág. 844. Si el daño es previsible por éste, hay responsabilidad; sino es previsible, estamos generalmente en presencia de un caso fortuito. *Montalvo v. Cruz, supra*, a la pág. 756.

El deber de cuidado incluye, tanto la obligación de anticipar, como la de evitar la ocurrencia de daños, cuya probabilidad es razonablemente previsible. El deber de anticipar y prever los daños no se extiende a todo riesgo posible. *Íd*. Lo esencial en estos casos es que se tenga el deber de prever en forma general consecuencias de determinada clase. Sobre este particular, el Tribunal Supremo de Puerto Rico, ha sido enfático al expresar que sin la existencia de este "deber de cuidado mayor" no puede responsabilizarse a una persona porque no haya realizado el acto de que se trate. *Hernández v. Televicentro*, 168 DPR 803, 813-814 (2006).

Ahora bien, el elemento de la previsibilidad se halla íntimamente relacionado al segundo requisito: el nexo causal. En Puerto Rico rige la teoría de la causalidad adecuada, la cual postula que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Cruz Flores v. Hosp. Ryder et al.*, supra. En *Rivera v. S.L.G. Díaz*, 165 DPR 408, 422 (2005), nuestro más Alto

Foro señaló que la relación causal, elemento imprescindible en una reclamación en daños y perjuicios, es un elemento del acto ilícito que vincula al daño directamente con el hecho antijurídico. *Nieves Díaz v. González Massas,* supra*,* págs. 844-845. Conforme con lo anterior, un daño podrá ser considerado como el resultado probable y natural de un acto u omisión negligente si luego del suceso, mirándolo retroactivamente, éste parece ser la consecuencia razonable y común de la acción u omisión de que se trate. *Hernández v. Televicentro*, supra, pág. 814; *Cruz Flores v. Hosp. Hosp. Ryder et al.*, supra.

Para establecer la relación causal necesaria, no es suficiente que un hecho aparente ser condición de un evento, si éste regularmente no trae aparejado ese resultado. Esta normativa ha sido fundamentalmente desarrollada con el propósito de limitar la responsabilidad civil a aquellos casos en que la ocurrencia de un hecho dañoso sea imputable moralmente a su alegado autor, porque éste era una consecuencia previsible o voluntaria del acto negligente. *Soto Cabral v. E.L.A.*, 138 DPR 298, 317 (1995).

Al aplicar el principio de la causalidad adecuada, el Tribunal Supremo de Puerto Rico expresó que "la difícil determinación de cuándo existe nexo causal entre el daño producido por un acto delictivo de un tercero y la omisión de cumplir con la obligación de tomar precauciones, medidas de seguridad y protección, no puede 'resolverse nunca de una manera plenamente satisfactoria mediante reglas abstractas, sino que en los casos de duda ha de resolverse por el juez según su libre convicción, ponderando todas las circunstancias'." *J.A.D.M. v. Centro Com. Plaza Carolina*, 132 DPR 785, 796 (1993).

El daño constituye el menoscabo material o moral que sufre una persona, ya sea en sus bienes vitales naturales, en su propiedad o en su patrimonio, causado en contravención a una norma jurídica

y por el cual ha de responder otra persona. En nuestro ordenamiento jurídico se reconoce la existencia de dos tipos de daños: los especiales, también conocidos como "daños físicos, patrimoniales, pecuniarios o económicos, y los generales, también conocidos como "daños morales". *Nieves Díaz v. González Massas*, supra.

Respecto a la *valorización de los daños y la revisión de las cuantías otorgadas,* el Alto Foro ha reconocido que, la estimación de los daños es una difícil tarea que descansa en la sana discreción del juzgador que ha recibido prueba detallada sobre los daños alegados, guiado por su sentido de justicia, ante todo, porque son ellos quienes tienen un vínculo más cercano con la prueba testifical y todos los componentes que lo rodean. *Cruz Flores v. Hosp. Ryder et al.*, supra; *Rodríguez et al. v. Hospital, et al.*, 186 DPR 889, 929 (2012); *Sucn. Mena Pamias*, et als *v. Meléndez*, et als, 212 DPR 758, 774 (2023). Se trata de una labor compleja porque no existe un mecanismo matemático que permita, de forma certera y uniforme valorar los daños exactos que recibe una persona. *Rodríguez Cancel v. AEE*, 116 DPR 443, 451 (1985); *Mena Pamias v. Jiménez Meléndez*, supra. Por tanto, la valoración de los daños siempre estará sujeta a cierto grado de especulación. *Sagardía de Jesús v. Hosp. Aux. Mutuo*, 177 DPR 484, 509, (2009).

La jurisprudencia ha buscado dar uniformidad y cerrar espacio para la arbitrariedad, utilizando comparativos al momento de establecer la compensación de los daños de una parte. Al revisar una sentencia del Tribunal de Primera Instancia que concedió daños, los foros apelativos deben considerar la prueba desfilada y concesiones otorgadas en casos similares resueltos anteriormente. A pesar de que reconocemos que cada caso es distinto y tiene circunstancias particulares, los precedentes son referencia útil para la determinación de si la compensación es exageradamente alta o

ridículamente baja. *Rodríguez, et als. v. Hosp., et als.*, 186 DPR 889 (2012); *Mena Pamias v. Jiménez Meléndez,* supra.  Es por ello que los tribunales, haremos el ejercicio de mirar aquellos otros casos donde se han probado daños similares para asimismo conceder compensaciones similares. *Escobar Galarza v. Banuchi Pons*, 114 DPR 138, 148 (1983).

Nuestro más Alto Foro ha advertido sobre la importancia de que el Tribunal de Primera Instancia detalle en sus dictámenes los casos que utilizó como referencia o punto de partida para la estimación y valoración de daños y el cómputo realizado para establecer las cuantías que se concedan. *Santiago Montañez v. Fresenius Medical,* 195 DPR 476, 493 (2016). En consecuencia, el Tribunal de Primera Instancia debe exponer de forma específica los casos similares que utilizó como referencia y el cómputo realizado para ajustar las cuantías concedidas en casos similares al valor presente. *Íd.*; *Mena Pamias v. Jiménez Meléndez,* supra.

Es norma reiterada que los tribunales apelativos no deben intervenir con las determinaciones de los juzgadores de primera instancia, salvo que medie pasión prejuicio, parcialidad o error manifiesto en la apreciación de la prueba. *Dávila Nieves v. Meléndez Marín,* supra. En los casos de daños y perjuicios, específicamente, se ha reconocido que la tarea judicial de estimar y valorar los daños resulta difícil y angustiosa porque no existe un sistema de computación que permita llegar a un resultado exacto con el cual todas las partes queden completamente complacidas. *Herrera Rivera v. S.L.G. Ramírez-Vicéns,* 179 DPR 774 (2010).

Es por lo que, los tribunales apelativos guardarán deferencia a las valorizaciones de daños que hagan los foros de primera instancia, porque son éstos los que tienen contacto directo con la prueba testifical y quedan en mejor posición para emitir un juicio.

*Rodríguez, et als. v. Hosp., et als.*, supra; *Herrera Rivera v. S.L.G. Ramírez-Vincéns*, supra, pág. 785.

En resumen, no intervendremos con las estimaciones de daños que los tribunales de instancia realicen, salvo cuando la cuantía concedida advenga ridículamente baja o exageradamente alta. La valoración de los daños está sujeta a un cierto grado de especulación y conlleva elementos subjetivos, tales como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos. *Íd*; *Cruz Flores v. Hosp. Ryder et al.*, supra; *Mena Pamias v. Jiménez Meléndez*, supra.

## C. *Regla 44.3 de Procedimiento Civil*

Nuestro ordenamiento jurídico reconoce dos tipos de intereses legales: los intereses presentencia (por temeridad) y los postsentencia. *SLG González Figueroa v. SLG et al.*, 209 DPR 138, 145 (2022). En lo pertinente, los intereses postsentencia, tienen la intención de evitar demoras irrazonables en el cumplimiento de las obligaciones declaradas judicialmente por sentencia, y estimular su pago en el menor tiempo posible. *Íd*. La Regla 44.3 de Procedimiento Civil regula lo pertinente al interés legal. En específico, esta dispone lo siguiente:

**Regla 44.3. Interés legal**

(a) Se incluirán intereses al tipo que fije por reglamento la Junta Financiera de la Oficina del Comisionado de Instituciones Financieras, y que esté en vigor al momento de dictarse la sentencia, en toda sentencia de dinero, a computarse sobre la cuantía de la sentencia que ordena el pago desde la fecha en que se dictó y hasta que ésta sea satisfecha, incluso las costas y los honorarios de abogado. El tipo de interés se hará constar en la sentencia.

La Junta fijará y revisará periódicamente la tasa de interés por sentencia, tomando en consideración el movimiento en el mercado y con el objetivo de desalentar la presentación de demandas frívolas, evitar la posposición irrazonable en el cumplimiento de las obligaciones existentes y estimular el pago de las sentencias en el menor tiempo posible.

El derecho a recobrar este tipo de interés es estatutario, es decir, opera por disposición de ley. Consecuentemente, forma parte de la sentencia y se puede recobrar, aunque no se mencione de forma expresa en el dictamen. *SLG González Figueroa v. SLG et al.*, supra, pág. 146. Nuestro Máximo Foro ha expresado que, este tipo de interés se encuentra disponible para toda parte victoriosa, su imposición es obligatoria, sin distinción de clase e independientemente si la parte contraria actuó o no con temeridad. *Íd.* Se deberá computar sobre la cuantía de la sentencia, incluyendo las costas y los honorarios de abogado, desde la fecha en que sea emitida la sentencia hasta que se satisfaga. *Íd.*

Expuesta la normativa jurídica que enmarca la controversia de epígrafe, procedemos a aplicarla a los hechos.

**III**

En su ***primer señalamiento de error***, la parte apelante sostiene que, erró el Tribunal de Primera Instancia al adjudicar el 65% de la responsabilidad a la AAA por los daños sufridos por la parte apelada y no haber adjudicado la mayoría de la responsabilidad al Municipio de Caguas, cuando estatutariamente, son los Municipios y no la AAA, quienes responden por desperfectos en la superficie de las aceras.

Arguye la parte apelante que, la prueba testifical desfilada durante el juicio demostró que, aunque la tapa con la que tropezó la parte apelada se encontraba como a una pulgada y media sobre el nivel de la acera, dicha tapa no se ajustaba a la medida del contador y en los récords no se encontró querella o queja alguna que advirtiera de alguna condición de peligrosidad en el área del accidente.

Añadió que, conforme al testimonio vertido en el juicio por el propio testigo del Municipio, como consecuencia del Huracán María,

el Municipio reparó unas losetas alrededor del contador de la AAA, ello, con posterioridad a la instalación del contador en cuestión. Por ello, la parte apelante le atribuye al Municipio el alegado desnivel en la acera.

En el caso de marras, como bien determinó el foro *a quo*, de la evidencia desfilada se desprende que, el 7 de septiembre de 2021, mientras la señora Reyes Díaz caminaba por la acera de la calle Ruiz Belvis, frente a la Plaza Santiago R. Palmer en Caguas, al llegar frente al local comercial que era Subway, tropezó con un desnivel que creaba la tapa de metal de un contador propiedad de la AAA.

Sobre el particular, es de notar que, en la determinación de hecho número dos (2), el foro primario consignó que: "El demandado Municipio de Caguas es una entidad con capacidad para demandar y ser demandada quien para la fecha del 7 de septiembre de 2021 estaba encargada de darle el mantenimiento a la acera de la Calle Ruiz Belvis, frente a la Plaza Santiago R. Palmer y lo que era *Subway* en Caguas."[9]

Durante la vista en su fondo, testificó el ingeniero José Rivera González, quien se desempeña como Inspector de Obras Públicas para el Municipio de Caguas.[10] Entre sus funciones están el velar porque la infraestructura vial, que incluye las vías de rodaje y las aceras de la infraestructura municipal y de las carreteras municipales estén en condiciones aceptables tanto para el tránsito como para los peatones.[11]

Coincidimos con el foro de instancia en que, la Autoridad de Acueductos y Alcantarillados es una entidad con capacidad para demandar y ser demandada y para el 7 de septiembre de 2021, era la dueña y encargada de dar mantenimiento a la tapa de metal con

---

[9] Este hecho fue estipulado como incontrovertido por las partes.
[10] Véase TPO, págs. 182-183.
[11] Véase TPO, pág. 185.

la que tropezó la señora Reyes Díaz y del contador que existe debajo de la misma.[12]

Conforme al testimonio del ingeniero Rivera González, la acera donde ocurrió la caída en controversia le pertenece al Municipio, mientras que la tapa con la que tropezó la parte apelada le pertenece a la AAA.[13] Dicho testigo reconoció que, a pesar de que el Municipio es el dueño de la acera en cuestión y que el desnivel de la tapa en controversia no cumplía con los parámetros de seguridad de las aceras, este hecho no le fue notificado a la AAA para que esta reparara dicho desnivel.[14]

Luego de una concienzuda evaluación de la prueba desfilada, colegimos que en el caso que nos ocupa, tanto la Autoridad de Acueductos y Alcantarillados como el Municipio fueron igualmente responsables por la caída sufrida por la señora Reyes Díaz. Lo anterior, al mantener una condición de peligrosidad en la acera que conocían o debieron conocer, toda vez que, a ambos les correspondía hacer las inspecciones correspondientes. A pesar de que el personal de la AAA debía inspeccionar la infraestructura en cuestión cada sesenta (60) días, sus inspectores no se percataron del desnivel o al menos, no hicieron nada para corregir dicha condición de peligrosidad.

El Municipio por su parte, falló al no inspeccionar la acera en cuestión y advertirle oportunamente a la AAA de la aludida condición peligrosa en la infraestructura de la primera para que esta procediera a corregirla. Lo anterior, nos conduce a concluir que ambas partes fueron igualmente negligentes, por lo que, en efecto, se cometió el error señalado.

---

[12] Véase TPO, págs. 183-184.
[13] Véase, TPO, pág. 183.
[14] Véase TPO, págs. 183-184.

En su **segundo señalamiento de error**, arguye la parte apelante que, erró el Tribunal de Primera Instancia al adjudicar una compensación excesiva en daños. Tal y como surge de la *Sentencia* apelada, el foro *a quo* le concedió a la señora Reyes Díaz, $20,000.00 por concepto de los daños físicos, lesiones, impedimento fisiológico y tratamiento médico. Además, le concedió la suma de quince mil dólares por concepto de angustias y sufrimientos mentales.

Nos argumenta la parte apelante que, los daños concedidos a la parte apelada por el foro primario son excesivos, ya que los únicos daños que esta sufrió fueron: diagnóstico de dolor de hombro derecho y rodilla izquierda. Aduce que, el foro primario erróneamente le adjudicó un dos por ciento (2%) de incapacidad general como consecuencia del accidente, lo cual nunca fue declarado así por el perito de la parte apelada. No nos convence.

Respecto a la valoración de los daños, tal como mencionamos en el derecho previamente esbozado, nuestra Alta Curia ha señalado que trata de una labor compleja porque no existe un mecanismo matemático que permita, de forma certera y uniforme valorar los daños exactos que recibe una persona. *Rodríguez Cancel v. AEE*, supra; *Mena Pamias v. Jiménez Meléndez*, supra. Por tanto, la valoración de los daños siempre estará sujeta a cierto grado de especulación. *Sagardía de Jesús v. Hosp. Aux. Mutuo*, supra.

Por tal razón, la jurisprudencia ha buscado dar uniformidad y cerrar espacio para la arbitrariedad, utilizando comparativos al momento de establecer la compensación de los daños de una parte. Al revisar una sentencia del Tribunal de Primera Instancia que concedió daños, los foros apelativos deben considerar la prueba desfilada y concesiones otorgadas en casos similares resueltos anteriormente. A pesar de que se ha reconocido que cada caso es distinto y tiene circunstancias particulares, los precedentes son referencia útil para la determinación de si la compensación es

exageradamente alta o ridículamente baja. *Rodríguez, et als. v. Hosp., et als.*, supra; *Mena Pamias v. Jiménez Meléndez,* supra. Es por ello que los tribunales, haremos el ejercicio de mirar aquellos otros casos donde se han probado daños similares para asimismo conceder compensaciones similares.

En su *Sentencia,* el foro *a quo,* consignó que, a pesar de haber realizado una búsqueda en la jurisprudencia, a los fines de valorar la indemnización justa y razonable por las lesiones sufridas en el hombro derecho y la rodilla izquierda, no encontró un referente idéntico, por lo que, consideró casos similares en los que se compensó por lesiones sufridas en la extremidad superior.[15]

A pesar de que la parte apelante considera que las sumas concedidas son excesivas, lo cierto es que no hizo referencia a ningún caso en particular, que pudiera utilizarse como referente, a los fines de modificar las cuantías concedidas. Por tal omisión, la parte apelante no nos puso en posición de intervenir con el dictamen del foro apelado, el cual merece nuestra deferencia.

En su ***tercer señalamiento de error***, la parte apelante le imputa al foro primario que incidió al imponer a la AAA una tasa de interés de 9%[16] cuando procede la tasa aplicable a instrumentalidades del ELA de 5.5%. En esencia, la parte apelante arguye que, de conformidad con su Ley habilitadora[17], la AAA es una instrumentalidad del Estado Libre Asociado de Puerto Rico, por lo cual el interés aplicable a la *Sentencia* apelada debe ser el 5.5%, tasa aplicable al Gobierno de Puerto Rico, según la tabla de Interés Legal del Comisionado de Instituciones Financieras. Le asiste la razón.

---

[15] El foro primario utilizó como referentes los casos *Soto Nazario v. Lugo*, 76 DPR 444 (1954), en el que el demandante sufrió una fractura en el brazo derecho y se le compensó en la suma de $5,786, que atemperada al valor actual de la suma de $41,714.52. Asimismo, utilizó el caso Vélez v. Atlas Line, 78 DPR 773 (1955), en el que se le compensó al demandante en la suma de cinco mil dólares ($5,000.00) por la fractura de una clavícula; cuyo cómputo al valor actual es de treinta y seis mil sesenta y un dólares con seis centavos ($36,061.06).
[16] En la Sentencia la juzgadora de instancia impuso un interés legal de 9.50% y no de un 9% como se menciona en el señalamiento de error.
[17] Ley Núm. 40 del 1ro de mayo de 1945, según enmendada, 22 LPRA sec. 142.

Como es sabido, la AAA, es una corporación pública con personalidad legal distinta y separada del Gobierno de Puerto Rico; como tal, goza de una estructura corporativa semejante a la de las corporaciones privadas.[18] La AAA funciona como una "instrumentalidad gubernamental autónoma" y lleva a cabo servicios esenciales para el país.[19]

Atinente a la controversia que nos ocupa, previo a la promulgación de la vigente Regla 44.3 de Procedimiento Civil, *supra*, en el caso *Gutiérrez v. AAA*, supra, pág. 145, nuestro Tribunal Supremo atendió la controversia sobre si procedía extender a las corporaciones públicas el mismo interés legal por sentencia que le aplica al Estado, sus agencias e instrumentalidades, y a los municipios. Sobre este particular, el Máximo Foro avaló la determinación de la Junta Financiera de imponer distintas tasas de interés por sentencia para los entes gubernamentales incluyendo a las corporaciones públicas, entre estas, la AAA.

Por otro lado, la Regla 44.3 de Procedimiento Civil, *supra*, dispone lo siguiente:

**Regla 44.3. Interés legal**

(a) Se incluirán intereses al tipo que fije por reglamento la Junta Financiera de la Oficina del Comisionado de Instituciones Financieras, y que esté en vigor al momento de dictarse la sentencia, en toda sentencia de dinero, a computarse sobre la cuantía de la sentencia que ordena el pago desde la fecha en que se dictó y hasta que ésta sea satisfecha, incluso las costas y los honorarios de abogado. El tipo de interés se hará constar en la sentencia.

La Junta fijará y revisará periódicamente la tasa de interés por sentencia, tomando en consideración el movimiento en el mercado y con el objetivo de desalentar la presentación de demandas frívolas, evitar la posposición irrazonable en el cumplimiento de las obligaciones existentes y estimular el pago de las sentencias en el menor tiempo posible.

---

[18] Ley Núm. 40 del 1ro de mayo de 1945, según enmendada, *supra*, sec. 142, et seq.
[19] *Gutiérrez v. AAA*, 167 DPR 130, 140 (2006).

Como mencionamos previamente, la *Sentencia* que nos ocupa fue dictada el 23 de enero del 2024. El interés legal aplicable para el Gobierno y sus instrumentalidades, en ese entonces, era de 5.50%, mientras que, para entes privados era de 9.50%. Debido a que la AAA es una instrumentalidad gubernamental autónoma, es de aplicación el interés legal aplicable al Gobierno, entiéndase, el 5.50%.

Como **cuarto señalamiento de error**, la parte apelante plantea que erró el Tribunal de Primera Instancia al declarar No Ha Lugar la *Solicitud de Determinaciones Adicionales de Hechos y Reconsideración de Sentencia* presentada por la AAA el 12 de febrero de 2024.

Cabe señalar que, a pesar de que el error señalado se refiere a las determinaciones de hechos solicitadas y no realizadas por el foro *a quo*, en su escrito de apelación, la parte apelante no desglosó de manera precisa dichas determinaciones, sino que se limitó a "incorporar por referencia" las alegaciones hechas en la *Solicitud de Determinaciones Adicionales de Hechos y Reconsideración de Sentencia.*[20]   No obstante lo anterior, revisado el aludido anejo, reseñamos las determinaciones de hechos solicitadas por la parte apelante:

1) que el expediente médico de la demandante refleja prueba de una caída en su hogar previo a la caída de la Demanda de autos, hecho que la demandante ocultó y negó bajo juramento;

2) que la señora Pizarro no es ingeniera de profesión y no tiene los elementos de juicio ni el conocimiento pericial sobre lo que serían los "parámetros o reglamentación aplicables a las aceras;

3) que no hay prueba que demuestre que el lector de la AAA tiene los conocimientos técnicos necesarios para evaluar posibles condiciones de peligrosidad de las tapas, ni es esa función parte de las obligaciones de su empleo;

---

[20] Apéndice IX del recurso, págs. 68-75.

4)   que al menos desde el paso del Huracán María, el Municipio de Caguas debió haber conocido de la condición de peligrosidad del área del accidente;

5)   que se elimine de la nota al calce número 5.[21]

Al evaluar ponderadamente las determinaciones de hechos solicitadas por la parte apelante, luego de una minuciosa revisión de la transcripción de la prueba oral desfilada, no vemos razón por la cual intervenir con dichas determinaciones de hechos realizadas por el foro primario.

En cuanto a la primera determinación solicitada, si bien es cierto que surge del expediente médico que la señora Reyes Díaz había sufrido una caída previa, no se desprende de la evidencia desfilada que la misma hubiese tenido secuelas que de alguna manera, pueda incidir con la determinación de impedimento relacionado a la caída que nos ocupa.   Puntualizamos que, ni la AAA ni el Municipio presentaron prueba pericial para demostrar que los daños sufridos por la parte apelada se debieron a una caída anterior o que esta sufría algún daño preexistente.   El mero hecho de que la parte apelante haya sufrido una caída, en ausencia de prueba a esos efectos, no implica necesariamente que haya sufrido daños residuales como consecuencia de esta.

Por otro lado, en cuanto a las determinaciones de hechos solicitadas 2 y 3, es meritorio señalar que ni la señora Pizarro ni la funcionaria de la AAA, testificaron en calidad de peritos, sino sobre el conocimiento personal que tenían del asunto en cuestión.

Respecto a la cuarta determinación solicitada por la parte apelante a los efectos de que, al menos, desde el paso del Huracán María, el Municipio de Caguas debió haber conocido de la condición

---

[21] La referida nota lee de la siguiente manera: "La demandante tuvo una caída previa a la de autos, pero en la misma no hubo lesión o daños algunos a las regiones anatómicas afectadas en esta ocasión. La demandante tenía condiciones preexistentes en las áreas lumbares y cervicales, condiciones que el perito tomó en consideración al momento de evaluarla para determinar el impedimento.  Por lo tanto, quedó establecido que el impedimento de 2% es exclusivamente relacionado a los daños sufridos por la caída del caso de autos."

de peligrosidad del área del accidente; tampoco habremos de intervenir. Lo cierto es que, de la prueba desfilada no se desprende en qué fecha se instaló la infraestructura de la AAA ni desde cuando específicamente, existe el desnivel en cuestión. La única referencia al Huracán María, la hizo el ingeniero José Joaquín Rivera González al mencionar que: "Eh, si mi memoria no me falla con el Huracán María hubieron (*sic*) unos árboles que se cayeron y se decidió reemplazarlos con adoquines en vez de volver a sembrar árboles y entonces, pues, poner los tiestos".[22] Sin embargo, no surge de la prueba desfilada si los aludidos adoquines se instalaron con posterioridad a la infraestructura (contadores) de la AAA.[23]

En cuanto a la última determinación de hechos solicitada por la parte apelante, para que se elimine la nota al calce número 5, lo cierto es que, de la transcripción de la prueba oral no surge evidencia que nos mueva a variar la determinación del foro primario. Consecuentemente, colegimos que la primera instancia judicial no cometió el error señalado.

**IV**

Por los fundamentos que anteceden, se *modifica* la *Sentencia* apelada, a los fines de determinar que: 1) tanto la AAA como el Municipio de Caguas le responden a la señora Reyes Díaz, en un cincuenta por ciento (50%) de responsabilidad cada uno por la caída sufrida por esta, y 2) a los fines de reducir el interés legal por sentencia al 5.50%, en lugar del 9.50% impuesto y así modificada, se *confirma* la *Sentencia* apelada.

Notifíquese.

---

[22] Véase, TPO, pág. 189, líneas 1-6.
[23] Véase, TPO, pág. 190.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones